STATE OF NEW JERSEY, ACTING BY AND THROUGH ROBERT A. ROE, COMMISSIONER OF THE DEPARTMENT OF CONSERVATION AND ECONOMIC DEVELOPMENT, PLAINTIFF-RESPONDENT, v. VACATION LAND, INC., A CORPORATION OF NEW JERSEY, DEFENDANT-APPELLANT, AND SIDNEY FRANKEL, DEFENDANT.

Superior Court of New Jersey
Appellate Division

Argued October 31, 1966—Decided November 8, 1966.

472

Before Judges GOLDMANN, KILKENNY and COLLESTER.

*Mr. James M. Davis, Jr.,* argued the cause for appellants (*Messrs. Powell and Davis,* attorneys).

*Mr. Henry Sevrin,* Deputy Attorney General, argued the cause for respondent (*Mr. Arthur J. Sills,* Attorney General, attorney).

The opinion of the court was delivered by

GOLDMANN, S. J. A. D. Defendant Vacation Land, Inc. appeals from a judgment based on a jury verdict awarding it $19,500 in condemnation, as well as from the denial of its motion for a new trial, on the grounds that the verdict was contrary to the weight of the evidence and grossly inadequate.

The State, through its Commissioner of Conservation and Economic Development, and in pursuance of its Green Acres

Program, brought condemnation proceedings to acquire 94.89 acres of land in Bass River Township, Burlington County. The property is surrounded by Bass River State Forest except for some 142' fronting on a road. The acreage is woodland and was acquired by defendant on April 6, 1962 for $24,000. On June 26, 1964 defendant conveyed two 20' x 100' adjoining lots to Sidney Frankel for $395, the deed being recorded on July 10 following. The complaint in condemnation was filed July 13, 1964, and was subsequently amended to include Frankel's property. The jury awarded Frankel $395 at the same time it returned a verdict of $19,500 for defendant. There is no appeal from the Frankel award.

Defendant's first witness was David M. Kaplan, a local real estate broker and appraiser. He did not fix a value on the basis of sales of comparable properties, but on his evaluation of the highest and best use for the tract—its development as campsites. He mentioned its accessibility to the state forest, certain rivers in the area, and the Atlantic Ocean, and then referred to an old plot plan, filed in 1898 but redrawn for defendant in 1962, which allowed for a total of approximately 1,800 lots measuring 20' x 100'. A reasonable size for a campsite in today's market, he said, would be 40' x 100', resulting in 900 lots. However, it would be necessary for a developer to lose 200 of these lots in providing certain facilities and what was described as "central public land" to service the campsite areas. The remaining 700 lots could be promoted and sold for $400 each. Against this figure he allowed $200 a lot for installing roads and promoting sales, and thus arrived at a figure of $140,000 as the value of defendant's tract.

Cross-examination elicited that Kaplan had not checked the local zoning ordinance which required a 75' lot width and also the licensing of tourist camps. He admitted he had no knowledge of any sales of comparable land in the area. Nonetheless, he testified that he had used the so-called Market Data Approach which, by his own definition, "is used to reflect a value of the property under consideration * * * by analyzing the sales of comparable or similar properties with

weight given for many factors, including time, size * * *." He further admitted that he was unaware of the local subdivision ordinance and said that if it existed it might be possible to get a variance.

Defendant's other expert witness was Henry S. Haines, a local real estate and insurance broker. He disregarded the plan used by Kaplan as not feasible for subdivision purposes because of the existing subdivision ordinance, the 75' x 100' lot requirement, and the different street layout that would be needed. In his opinion, the highest and best use for the tract would be for campsites. His approach was not to consider lot size, but front foot value. To do this he projected the need for two arterial roads going through the tract, with seven lateral roads crossing them, and in this way arrived at a total lineal frontage of 25,928' which, at $10 per front foot, produced a figure of $259,280. The installation of roads, plus promotion costs, would require $152,510, leaving a fair market value of $106,770.

Haines did not use any sales of what he considered comparable property. However, he referred to a number of developments possessing various characteristics and which, in his opinion, could not be used for purposes of comparison because they were not similar. His only reason for referring to these developments was that they showed there was a market for land of this character to be used for subdivision or for campsites. On cross-examination he was questioned about certain sales within the immediate area, but said that he was unfamiliar with them. These are the sales used by Leon Wack, real estate broker and appraiser, who testified on behalf of the State.

Wack testified, as had Kaplan, that of the three land valuation methods (the Income, Cost or Reproduction, and the Market Data Approaches), only the last could be used in the circumstances. He then described three comparable sales in the area: (1) 44 acres sold on August 10, 1963 for $1,500 (about $35 an acre); (2) 125 acres sold on April 28, 1962 for $12,250 ($98 an acre), and (3) 504 acres sold on October

3, 1963 for $24,750 ($49 an acre). These tracts were similar to defendant's. Using these three sales as an indication of market value, he concluded that defendant's tract was worth $75 an acre, or $7,065.

On cross-examination Wack said that at the time he valued the property he knew of the $24,000 purchase price and of an existing purchase money mortgage of "approximately" $16,-000-$17,000. However, he considered the subject property comparable in varying degrees to each of the three mentioned sales. Asked why he did not value the property at $35 or $49 an acre—the prices brought in two of the sales—he said he considered defendant's property superior by reason of location.

Defendant contends that the jury verdict can be set aside where it appears it was the result of mistake, partiality, prejudice or passion and, in the circumstances, should have been set aside. *R. R.* 4:61–1 (a) sets out the test to be applied on a motion for a new trial in jury cases:

"* * * On a motion for a new trial in an action tried before a jury, the trial judge shall not set aside the verdict as against the weight of the evidence unless, having given due regard to the opportunity of the jury to pass upon the credibility of the witnesses, it clearly and convincingly appears that the verdict was the result of mistake, partiality, prejudice or passion."

As the transcript of the argument on the motion demonstrates, the trial judge was fully aware of that rule, and as cautious as it required him to be. The only reason that might be advanced for setting the verdict aside, he said, was that the jury made a mistake, and in his opinion the jury had not. It had viewed the site and heard the evidence. It was not obliged to value defendant's property by the single sale made to Frankel. Nor did it absolutely have to follow the comparable sales; it could take into consideration differences in neighborhood, conditions, suitability, and all the other variables that entered the picture. Although the verdict was "conservative," and lower than he would have fixed as a fair value, there was nothing to show that it reflected mistake on

the part of the jury. The trial judge cited *Kulbacki v. Sob-chinsky,* 38 *N. J.* 435 (1962), as stating his proper role on a motion for a new trial.

■■ Both sides admit that a verdict may not be set aside unless it is so far contrary to the weight of the evidence as to give rise to the inescapable conclusion of mistake, passion, prejudice or partiality, citing *Hager v. Weber,* 7 *N. J.* 201, 210 *et seq.* (1951), and *Monihan v. Public Service Interstate Transp. Co.,* 22 *N. J. Super.* 149, 154 *(App. Div.* 1952). That test has more recently been reaffirmed in stronger terms by Justice Schettino writing for the court in the *Kulbacki* case, above, 38 *N. J.,* at *pages* 444–445. It was there pointed out that the trial judge must "canvass the record, not to balance the persuasiveness of the evidence on one side as against the other, but to determine whether reasonable minds might accept the evidence as adequate to support the jury verdict * * *." If the answer to that inquiry is in the affirmative, the motion must be denied.

■ Justice Schettino then described the scope of appellate review as "in fact more limited" (at *page* 146), quoting from *Hartpence v. Grouleff,* 15 *N. J.* 545, 549 (1954), where the court noted that since the trial judge sees and hears the witnesses and has the feel of the case, his action is entitled to great weight where the verdict is assailed as being against the weight of the evidence. In the light of *Hartpence* and other cases, said Justice Schettino, "Appellate courts are not privileged to disturb the order [denying a motion for a new trial] 'unless it clearly and unequivocally appears there was a manifest denial of justice under the law.' " (38 *N. J.,* at *page* 452) We approach defendant's contentions in that light.

Defendant claims that the verdict must have been a mistake since the jury adopted one standard of compensation for the Frankel property, which had been detached from the original 94.89 acres, and a different standard for the remainder of the tract. It alleges that there was no evidence as to any difference between the Frankel lot and the large tract. We cannot agree.

The jury plainly decided to award Frankel the $395 he had paid only a few days before the complaint in condemnation was filed. The State obviously did not appeal this part of the verdict because of the small amount involved. However, the Frankel award does not necessarily mean that the jury had to value the large tract on the basis of $395 for two lots measuring 20′ x 100′ each. Defendant's argument ignores the fact that there was testimony as to the difficulty of subdividing defendant's property, supplying the necessary facilities (such as roads, water and sewers), the cost of promotion and other development costs, and the time it would take defendant to sell off all the lots in its development. There was no testimony describing the location or characteristics of the Frankel property. The jury might well have considered all of these factors, including its inspection and its appraisal of the testimony given by the several experts, in arriving at its verdict.

In determining valuation the jury is under no obligation to accept as completely true the testimony of any expert witness. It may adopt so much of the testimony as appears sound, reject all of it, or adopt all of it. *In re Housing Authority, Bayonne,* 21 *N. J. Super.* 254, 257 (*App. Div.* 1952) ; *State Highway Comm'n v. Mayor, etc., of Dover,* 109 *N. J. L.* 303, 307 (*E. & A.* 1932).

Under our 1947 *State Constitution, Art.* I, *par.* 20, and the Eminent Domain Act, *N. J. S. A.* 20:1-9, an owner of property taken for public use must receive just compensation, and the measure of that compensation is the fair market value. Authorities agree that by far the most satisfactory proof of such value—*i.e.,* what a willing buyer would offer a willing seller, *City of Trenton v. Lenzner,* 16 *N. J.* 465, 476 (1954), *certiorari* denied 348 *U. S.* 972, 75 *S. Ct.* 534, 99 *L. Ed.* 757 (1955)—in a condemnation action is comparable sales: "here is where 'money talks.' " 4 *Nichols, Eminent Domain* (*rev. 3d ed.* 1962), § 12.311[3], *p.* 93. If a witness, instead of using comparable sales, testifies as to potential use, the probative value of such testimony on the question of mar-

ket value is to be tested, among other things, by the reasonable probability that the property could be put to that use within a reasonable time. *Ibid.*, § 12.314, at *pages* 148–153.

Defendant's witnesses admitted that comparable sales was the only valuation method usable in this case, and yet they assigned high valuations on the basis of what they deemed the best potential use. However, cross-examination effectively showed that there were many "ifs" attached to their proposed use, not the least of which were subdivision approval and the installation of roads and other facilities. Further, the preparation of the tract for sales, and the promotion and effectuation of those sales, would have taken several years. A jury could readily have discounted the testimony of defendant's experts as practically worthless. *Cf. Port of New York Authority v. Howell*, 59 *N. J. Super.* 343, 347–348 (*Law Div.* 1960), affirmed 68 *N. J. Super.* 559 (*App. Div.* 1961).

██ █ On the other hand, the State's witness testified on the basis of comparable sales involving tracts having substantially similar characteristics. This is all the foundation our cases require for such evidence to be considered as valid and probative. *Mooreslown Tp. v. Slack*, 85 *N. J. Super.* 109, 114 (*App. Div.* 1964), certification denied 43 *N. J.* 452 (1964). The weight to be accorded such sales is for the fact-finder. *Ibid.*

██ We do not view the verdict as one arrived at because of mistake, passion, prejudice or partiality; at most, it was on the conservative side. That was the conclusion arrived at by the trial judge, and one in which we join.

The judgment is affirmed.